This is Palin versus New York Times. Okay, is it Voight or Vox? How do you pronounce your name? It's Voight, Your Honor. Voight. Say it again. Just like vote in an election. Vote in an election. All right. Mr. Voight, you've reserved three minutes for rebuttal. Yes, Your Honor. Let me just make sure everybody's ready, because I think I hear a shuffling of papers. So, sometimes we have to turn tabs. Just give us 30 seconds. 10 seconds. All right. You may proceed. Thank you. May it please the Court and Counsel, good morning. My name is Shane Voight, and I represent Sarah Palin in this action. We're back before this Court on the same issue that we were here for just about five years ago, which is actual malice. For the reasons that we've explained in our briefing, we don't think that that rule should be applied in the first place. We think the times have changed so significantly since that rule was created by an unelected branch of our government 60 years ago that it has no place in the modern speech landscape. Why isn't that a question for the Supreme Court to decide? We have a precedent in this case that we have to deal with, right? Sullivan? Sorry. I'm sorry, Your Honor, I didn't mean to. We have a precedent that we have to deal with. You're a conjugate, Sullivan. I agree, and I think if we're talking about attacking the foundations and the textualism under which that rule came about, I think you are bound by that. The argument that we made in the district court that I'll make again here is that if you look at Curtis v. Butts and Time v. Hill, the Supreme Court explicitly stated, quote, the blind application of Times v. Sullivan. They cautioned against that and specifically noted that courts need to look at the circumstances surrounding the publication. I think you're wasting time for oral argument by spending a lot of time on this question, which is a matter of Supreme Court precedent as we look at it right now. I think there are other issues here that we might want to address. Oh, I agree, Your Honor. I was briefly touching and then I was going to move on. This isn't the English system where we're going to give you all day. I understand. So as I started off with, we're here over actual mouse, the same issue we were here on, and the same issue that this particular district court was reversed on five years ago, and many of the same errors were made that were made that led to that reversal, particularly as it relates to the Rule 50 decision here. Well, there were a lot of things pled in the complaint that later on maybe didn't materialize at trial and specifically were given different weight by the judge in terms of what he was going to let in or not let in. So I don't think you can really look to the prior decision, which I'm familiar with, as necessarily precluding anything in this case. We now have a trial that took place and a Rule 50 motion and a jury verdict. Right. And the Rule 50 motion was governed by the same standards that this court looked at, which is that the court can't weigh evidence. It can't make credibility determinations. It has to draw inferences in our favor, and it can't disregard evidence of actual mouse that we submitted, and all those things happened here. I mean, when you read through the 68-page written opinion on the Rule 50 motion post-trial, it reads like an argument. Assume that the judge hadn't written that and the jury just decided the case. Then we'd just be looking at whether or not the evidence was sufficient for a jury verdict, right? Potentially, if the other errors that occurred during the course of this case had not also happened. Yeah, I understand that. And so I'm focusing on the jury trial aspect of it because at the end of the case, when the judge learned of the push notifications, and the push notifications occurred and actually were present in the jury room, five and a half hours after they'd started deliberations, and then they took another five and a half hours to reach a verdict, they reached a verdict of adventure client, you did not make that point that maybe the jury was tainted, maybe a new trial is needed. That point wasn't made in your appellate brief and not in your reply brief in this case. So why hasn't that issue been waived? Any disturbance of the jury verdict by the push notifications or the jury deliberations by the push notifications has been waived. And therefore, we have to take the verdict as if there had been no pushes. Well, I believe that we did raise the issue in the timing of the push notifications in our briefing in this case. You mentioned it. Of course, the jury unsurprisingly reached a conclusion. But that's not an issue that was raised as a point in your brief and nor in your reply brief. And normally we require that before we will decide it. Why isn't the easiest, the most straightforward way to decide this case is to say, you know, Rule 50 motion is beside the point. The jury reached a decision and the one possible objection in terms of the process of jury deliberation was never pressed by the defense and by the plaintiff. And therefore, we're looking at it as a regular jury case, jury decision and jury verdict. A couple of points there. I think we did sufficiently raise it in our briefing. We obviously raised it in post-trial motions and in the prior petition that we made in this court that was denied without prejudice and to be raised in this appeal. Post-trial motions are different, right, from raising it at the time that it occurred and then pressing it in your brief to us. I mean, I don't need to go to your brief, right, to find that it's not a point that's made. I understand, Your Honor. I don't believe it was raised as a separate point, except it may have been brought up in the factual background section and highlighted there. And we sort of interwove those concepts for purposes of spacing. But I don't think that a jury you can affirm or find in favor of the jury decision because of other issues we have also raised in conjunction with that Rule 50 decision. I agree with that. And we did, I believe we did sufficiently attack the timing of the Rule 50 decision and even cited Supreme Court precedent in our briefing talking about how the court doesn't have to make that decision at that particular time. So we may not have focused our briefing arguments on push notifications, but I think we did raise arguments in there with time. There was a discussion about it before the judge, before the district judge. And then later on, it didn't seem to be pressed by you. It stopped your interest and it sort of diverted to other subjects. And we may not have highlighted the issue as much as we did in some prior briefings. But I think that's because we were trying to deal with the sheer volume of what we see to be fundamental errors here, which- Can I just ask, getting back to the Rule 50, it seems to me if the district court was right on the Rule 50, then what happened with the jury doesn't even matter, right? I'd agree procedurally with that, Your Honor. And so your argument as to the error with the Rule 50 seems to me boils down to principally that Bennett makes a statement in his testimony at trial in which he says that he never believed that there was a link between the math and the shooting. And then there's also a link to another news article that Judge Rakoff didn't consider because he said there was no evidence that Bennett had opened that link. And so I thought you would spend some time on that to explore why that was incorrect. Well, and I've obviously been answering some questions from the panel here today, but there's a wealth of evidence that we submitted in support of our case at this trial. Not just the evidence, Your Honor mentioned this admission that he had actual knowledge of falsity, which when you combine that with the jury question that came during the course of the trial that we've also raised as an issue, it shows the significance of that testimony, we believe, of Mr. Bennett. The refusal to click on the hyperlink, which I'll note in our briefing we addressed that during the summary judgment phase when Judge Rakoff found fact issues for a jury, he specifically talks about the fact that the failure to click on that link because of the fact that there was information available at that time demonstrating that further investigation should occur. Well, that's what I wanted to understand about the hyperlink because the hyperlink was there when Bennett received the draft from Williamson, correct? Correct. And he didn't alter that hyperlink, or it was left there, and it was left there in the same context that she furnished it, that as something that was evidence of the fact that it was circulated at the time, and it's hyperlinked to the word circulated, correct? Correct. And it remains hyperlinked to the word circulated. So my question then is once the editor takes the document from the drafter, does his obligation to fact check go to her facts, the facts that she put in, or is it just the facts that he added? I believe that he would need to fact check the entire piece to make sure it's consistent once he makes those significant changes to it. What was the evidence on that? Was there evidence on that apart from your belief? There was evidence. What the New York Times practice was on that? Yes, there was evidence from Linda Cohn and also Ms. Williamson on the fact checking process that takes place, particularly when there's a rewrite, and in this instance, a significant rewrite. But Bennett testified that he expected the fact checking to be done to the reporter or the writer whom he returned it to. The jury could have credited that, no? Possibly, but Ms. Williamson, the reporter he returned it to, contradicted that testimony. Well, she said she didn't think so. Possibly. The jury could have thought they were speaking at cross purposes to each other, but that wouldn't have compelled a finding of malice. I want to ask you about the response to the jury's question. I gather you don't disagree that Judge Rakoff correctly told the jury that they could draw inferences from the testimony regardless of who asked the question. That's what they asked, and that's what he told them. What I understand your identification of error is, is Judge Rakoff telling the jury that Bennett's answers and inferences could not by themselves support a finding of malice, though they could be considered with other evidence. That's the part of the instruction that you have a problem with, right? Correct. What did you tell the judge about that at the time, about that part of his response? That it was inconsistent with the other jury instructions on the weight of circumstantial evidence as well as the actual malice jury instruction. I'm not sure I'm following. What was wrong about what he said? A testimony given by Mr. Bennett and a reasonable inference drawn therefrom is sufficient in and of itself to carry the plaintiff's burden of showing by convincing evidence. Well, I think Judge Rakoff, again, we are reading a cold record, was concerned that the jury might draw an adverse inference of malice if it disbelieved Bennett. And if I understand your argument, it's no, that they could have drawn an inference of malice if they believed Bennett, specifically believed him, that he must have read the editorial that said that you couldn't clearly ascribe the Giffords shooting to the Crosshair website. Is that right, that they could have believed Bennett and found malice from that? My perception is that Judge Rakoff... Is that the concern you had with the judge's charge? It's one of the concerns, yes. All right. What's the other? That it is not a correct statement of the law and that it was inconsistent with the jury instructions on circumstantial evidence. Okay. Thank you. So I'm significantly over. Do you want me to yield or...? Well, you've reserved three minutes for rebuttal, so we'll hear from you again. We'll now hear from Mr. Brown. Thank you, Your Honor, and may it please the Court, J. Ward Brown for the defendants' appellees, the New York Times, and James Bennett. With respect to the issue of whether the actual malice standard applies to the case, I'm inclined to stand on our papers, unless you have specific questions for me, with one request with respect to the First Amendment source of that standard, which is that we would respectfully ask the Court to deal with the waiver by Ms. Palin of that argument by having failed to raise it entirely in the proceedings in the District Court on the motion to dismiss or in this Court on the first appeal. We ask that you address that issue because, to the extent Ms. Palin chooses to pursue further relief in connection with this case, resolution by this Court of her waiver of that argument would obviously have important effect. In addition, of course... If we're bound by Sullivan, then we don't really have to get into all of that. What you'd like is a ruling from us that you could use in the future. That isn't really necessary for us to make. And that's why I respectfully made that request, Your Honor, exactly. And obviously we believe that the Court is bound to apply the First Amendment version. And before turning to some of the issues that the Court expressed interest in, I'll just make a brief observation with respect to the anti-SLAPP statute, which we would also ask the Court to resolve whether it applies here for similar reasons. And here, of course, the New York Court of Appeals has so far avoided firmly ruling on whether the anti-SLAPP statute, which supplies the actual malice standard as a matter of state law, applies retroactively. Why do we need to get that if we are not going to upset the Supreme Court's ruling in Sullivan? Again, Your Honor, because whether the anti-SLAPP statute applies has consequences, both in terms of future activity in this case... So we should write out an advisory opinion that would be useful to others? Let's get to some of the other issues. Fair enough, Your Honor. I don't know how much you guys really want to spend time talking about issues that are not central. Let me ask you to focus on the last question I asked your adversary, which has to do with Mr. Bennett having given answers to having seen an editorial that, why if it were credited, his statement that he saw it and read it, why couldn't that support a finding of malice? When you say saw it and read it, which it are you referring to, Your Honor? I refer from that that I did read that he's speaking about the editorials that Phoebe Lett sent him, one of which said that it would be a mistake to draw the conclusion that the Gifford murder was directly caused by the Palin post. First and foremost, Your Honor, the answer to that is because there are two aspects of actual malice at issue here. One is subjective awareness of falsity of the challenge statement, and then the second aspect is subjective awareness by Mr. Bennett that his words would be understood as the alleged statement. But let me put the second aside for a moment. Why wouldn't it suffice to satisfy the first prong that you've identified? Because, Your Honor, when you look at those articles, both the editorials, the New York Times pieces that were sent by Ms. Lett, as well as other articles that plaintiff argues should have been admitted but were not, the articles in general do not reach a definitive conclusion about whether Mr. Luffner did or did not see and act on the basis of the mat, but rather make the point that at the time those articles or editorials or opinion pieces were published, no affirmative evidence that he had seen them had been established. You're rewriting it now. The editorial that I'm looking at is the one entitled Bloodshed and Invective in Arizona, and it says it would be facile and mistaken to attribute this particular madman's act directly to Republicans or Tea Party members. And what Mr. Bennett wrote was that there was a direct link and that it was clear that there was such. Now, I'm not saying that a jury would have had to find malice from his testimony, but why wouldn't it have been sufficient to support them finding it so as to raise questions about both that answer that the judge gave and his ruling as a matter of law that no verdict could be returned for the plaintiff. Your Honor, That's what I need you to address for me. And, Your Honor, what Mr. Bennett also testified was that the point he was making in the words he chose to use in the editorial was that that kind of rhetoric creates an atmosphere in which persons may feel OK to take action. He testified extensively, and the physical evidence, including the emails at the time, support his testimony. But in looking at this now in the light most favorable to the plaintiff, we would assume that they credited that he'd read them because he said that he must have. It would have understood the conflict, even the district judge understood the conflict between what he wrote and what he said, and they didn't believe his explanations. If that's how we look at this record, how is either the response to the question or the ruling as a matter of law sustainable? Well, with respect to the particular words that Your Honor quoted from the article, those are, of course, expressions of opinion, that it would be facile to attribute this. Mr. Bennett's point was that they Mistaken suggests that it would be a mistake of fact. Your Honor, that can be interpreted in more than one way, I would submit. But as Mr. Bennett explained in his testimony, based on his experience, particularly during his posting to Israel and his observation of the impact of political rhetoric there, he was focused, he testified, in his writing of the words he added to the editorial on the general atmosphere created by such violent rhetoric. But I understood him to basically say he must have read it, but obviously he wasn't thinking about it when he wrote words directly to the contrary. I'm not understanding him to have testified, yes, I saw that we had this, but I thought it was opinion, I thought there was counter evidence. I didn't understand that. Did I miss something in the record? Your Honor, with respect to the language that you highlighted a moment ago, that the link was direct, Mr. Bennett did testify that what he was referring to there is the fact that in the map an elected representative was identified by district in the map and that that particular, or one of those representatives, was the victim of the crime and that that is what caused him to use the word direct. And again, Your Honor, taking a step back and viewing those sentences in the editorial as a whole, as, of course, the Court is bound to do in interpretation. I mean, the issue is whether this goes to a jury, and so the issue is whether no reasonable jury could have taken this statement and concluded from that that your client was aware of falsity. I mean, he testified, I didn't think then and I don't think now that the map caused Jared Lochner to act. Correct, and that goes to the falsity element. That's what we're talking about. Right, but you have to begin with the proposition of what Mr. Bennett understood and believed his words would be communicating to his readers. That is, the knowledge with respect to meaning prong of actual malice. Well, that's the second prong. That's the awareness of understanding that you're asking us to do basically with the ninth and other circuit that's done, right? Correct. Which we have never done before. I'm not sad. Multiple circuits have held, Your Honor, that there is no actual malice if a journalist unknowingly makes a false statement about someone. And here it is not just Mr. Bennett's testimony, but the physical evidence, the e-mail exchanges before and after publication, the testimony of others that establishes what meaning he thought his words were communicating, which is different from the one alleged by Mrs. Palin. First of all, of course, the words he actually used in the editorial were that Sarah Palin's political action committee circulated a map. Mrs. Palin alleges that those words would be understood. That is, that readers would infer an implication that she personally circulated the map and thereby caused Mr. Luffner to act. I see my time is up. I would be happy to answer further questions. No, I got some more after that. And, therefore, this case does fall into the classic category of defamation cases in which the words actually published are not what the plaintiff relies on as the defamatory meaning. Rather, Mrs. Palin asserts that readers would have taken the words used and inferred that it was an accusation that she personally was the causative agent in the Luffner shooting. And she, therefore, under well-established precedent through multiple circuits cited in the briefs, is obliged to demonstrate that Mr. Bennett was subjectively aware prior to publication that that is how readers would interpret his words. She has to achieve both of those prongs of actual malice in this case and although our position clearly is that she failed on both prongs, it is indisputably the case on the second prong because there is literally no evidence to the contrary, including inferences. But we would, I mean, we haven't said that before. We haven't recognized this second prong that you are arguing now, right? As a circuit. So, all right, what's the Second Circuit case that says that? No, Your Honor. You have not had, this Court has not had directly to address that question in the past. The Ninth Circuit. What's the best case from the Second Circuit that suggests we'd even entertain it? It seems to me that the most recent cases on this, including Palin 1, suggest that there's really only the one prong. That was the only prong addressed on the motion to dismiss and subsequently on. So what's your best Second Circuit case to suggest that we, like the Seventh and the Ninth Circuit, recognize a second piece of that prong, that malice prong, which requires an awareness of the understanding of readers? Your Honor, I must confess that off the top of my head, I don't know which of your cases to refer to you on that point, except to say. Well, our cases generally used it with respect to defamation by implication. That's not this case. Why isn't it correctly limited to situations where what's being claimed is defamation by implication? Then you have to show malice regarding the defamatory meaning, but not where you've got defamation per se. Well, Your Honor, we also disagree that she has stated a claim for defamation per se here. But let me address the specific question you raised first. Here, Ms. Palin alleges in her amended complaint a different meaning than that represented by the literal words of the editorial. That is, readers of the editorial would need to draw inferences to get to what she alleges is the defamatory meaning. When Jared Lochner opened fire, the link to political incitement was clear. Correct, Your Honor. But first of all, the editorial doesn't say Ms. Palin circulated the map. It says that Sarah Palin's political action committee circulated the map, and that takes me- I guess we're going to take a broader view here, but I'm not sure, that he was talking about, at this point, an atmosphere or a society, a cultural phenomenon in which rhetoric was becoming violent. That's absolutely our position, Your Honor. I was trying to drill down to some of the specifics of these questions, but taking a step back, that absolutely is what Mr. Bennett testified to, and to the extent there was any concrete evidence of intent or purpose, it supported rather than contradicted his testimony in that regard. The link here was that someone who became a victim of violence was specifically referred to in a piece of political rhetoric, which at the time of the congressional shooting that prompted the editorial, there had been no example of that brought forward at that time. But with respect to Your Honor's comment about, per se, defamation, Your Honor- Let me focus you on that. The district judge found that it was per se defamation, and you have not cross-appealed that decision. Your Honor- Correct? So I'm not sure why we should entertain that it's anything other than per se defamation when we have an unappealed district court ruling on that. Your Honor, I believe that subsumed in the overall analysis here, but my answer goes to both of the two questions you've asked, including about the two elements of actual malice. And so let me just draw the Court's attention to the El Maison case, which is this Court's 1975 decision, in which an article suggested that a restaurant was a good place to meet a Coke dealer. The owner of the space where the restaurant was brought a defamation claim, which was dismissed, and then this Court affirmed the dismissal because the statement was directed to the place, the restaurant there, not the business that owned the place. And because the business that owned the place had failed to allege special damages, it was not actionable. And this Court in that case, citing the Stillman case, which had been a libel lawsuit brought against the Stillman Hospital, was held not actionable when brought individually by the owner of the hospital, Mr. Stillman, because he had failed to plead special damages. And that is precisely what we have here, is that a statement directed to a corporate entity having done something, then an individual who's, in this case, the namesake of that corporate entity, brings the claim. Well, let me ask you this. When this went to the jury, were they charged on defamatory meaning? Yes, Your Honor. Okay. And so your argument is that as a matter of law, they could not have found it? Could not have found it to be per se actionable, correct? Well, wait a minute. The finding is that it's per se false. You're now saying that there had to be a finding as to what? That he had specific knowledge of the defamatory meaning of this? Subjective awareness, yes. And your concern is that he wouldn't have had knowledge that it was directed at Ms. Palin because the editorial said that it was her path? That is part of it, Your Honor. And now this is a jury that heard that he drafted an apology to Ms. Palin personally? After he learned that readers were interpreting his statements to refer to her. The jury gets to hear this totality of the evidence. It made a finding, and you have not cross-appealed. Your Honor, it was our view that that issue did not need to be the subject of a separate cross-appeal. But again, I raise the point here because it relates both to the alternative ground raised below for judgment as a matter of law and because it relates to the actual malice issue before the court in terms of awareness of defamatory meaning. Thank you. What do you make of the correction? The correction, it seemed to me, was pretty clear that they had made a mistake. in suggesting that there was a link between what Palin did and the shooting. Of course, as the evidence indicated, Your Honor, Mr. Bennett was not the draftsperson of that language, but others at the Times were responsible for that. Well, the Times wasn't a fan, right? It is, but I just wanted to make the point that it wasn't Mr. Bennett who drafted that. And secondly, of course, post-publication conduct of that sort doesn't generally relate to state of mind of the responsible person for the original challenge statement. So it doesn't constitute an admission that the prior statement established a link that was mistaken or false? Your Honor, certainly the jury was entitled to consider that, but our position is that the jury correctly, from its verdict, concluded that that was not a dispositive issue. What about the point that I raised with your adversary of the fact that Judge Rakoff announced his decision on the Rule 50 motion to counsel and then found its way into the jury room through push notification? Under normal circumstances, why wouldn't we say that the jury was tainted by that? Therefore, the verdict can't stand and has to go back for a new trial. And let me just say, if the issue had been litigated that way, then why wouldn't the judge have really, at our compression, required a new trial? Your Honor, first of all, of course, it is our position, as reflected in our briefing, that Ms. Palin waived that issue by not arguing it in her brief to this Court, as you pointed out. But secondly, upon learning of those push notification, the record reflects. The waiver can be put aside for manifest injustice. Well, here, Your Honor, there is no evidence of manifest injustice. The Court polled the jurors on whether those push notifications had had any impact on them, and I believe it was three jurors who said they had seen them, responded that it had not impacted their decision making about the case. Were they polled in the courtroom? No, Your Honor. I thought it was a law court conversation with the jurors. Correct. And when the question of whether the party should have the opportunity to speak to the jurors about this came up, Ms. Palin declined that opportunity. And with respect to the question raised in front of my plaintiff's counsel about the jury instruction, the mid-deliberation instruction, and the response to it, I just would like to emphasize to the Court that, of course, the written jury instructions were provided to the jurors, the full set of instructions in writing. They had them throughout the case. And Ms. Palin has not raised any objection to the full set of jury instructions, and the jurors are presumed to have read and followed those. And although we disagree that there is any error in the response to the mid-deliberation instruction, to the extent this Court feels differently about that, the correct statement of those instructions is in front of the jury in writing throughout deliberations. What was correctly told to them about Mr. Bennett's testimony and whether it could support finding malice? What was the jury told in the written instructions that you think mitigated any problem with the oral ones? It specifically explained to the jurors how they were to treat circumstantial evidence, such as inferences drawn from testimony, and correctly stated that. Again, we don't believe there's an error in the responses made. But now he tells them that one piece of evidence, Mr. Bennett's testimony, and the inferences drawn from it could not be enough to support a finding of malice, and I'm not sure why that's correct. Your Honor, because of course we don't know which question the jury and answer the jury is referring to. They're told in general his testimony cannot support it. As I said, I understand it if Judge Rakoff's concern was that they would disbelieve Mr. Bennett and therefore draw an inference about something that they had actually no testimony on. But I'm not sure that he considered the possibility that they would believe Mr. Bennett, and then what could they find with respect to malice based on that? With respect to the inference, which the question and the answer are focused on, a single piece of circumstantial evidence, that is an inference drawn from some direct evidence, is not, as a matter of law, sufficient to establish actual malice by clearing convincing evidence. Well, I'm not sure that we're talking about the same thing. He admitted he saw the editorial. Now, the inference they're going to draw from that is that, therefore, he knew that what he wrote was not true. I'm not sure that's a problem for identifying malice. They're finding, based on what he admitted he knew, that he couldn't have not known that his own writing was not truthful. Your Honor, I'm not clear on which admission by Mr. Bennett you're referring to here. You don't know which admission? The one I referred you to at the start. The three editorials that misled. He had read the editorial that said that it would be mistaken to think that there was any direct link. Right. And, Your Honor. Also mistaken to attribute this particular madman's act directly to Republicans or Tea Party members. Right. And then he writes that it was clear that the link to political incitement was clear, and that in the Virginia shooting there was no sign of incitement as direct as in the Giffords attack. Those are the two pieces of evidence. And as Mr. Bennett explained in his testimony, when he said direct and clear, what he thought he was communicating. I understand that the jury could have found favorably based on what he testified, but I'm concerned with the fact that they're told that there is no way that they can take this juxtaposition and infer malice from it, and I'm not sure I understand why that's so. Why, as a matter of law, no reasonable jury could find malice? Your Honor, the words that you just read from that editorial do not establish that it would be false to suggest there was a link. It suggests it would be facile, it would be inappropriate. Mistaken. Mistaken. Yes, but again, there is an expression of opinion there in strong terms. Mistaken is not an expression of opinion. It's saying it's not the fact. Your Honor, I would just urge the court to read that entire editorial as well as the other two that Mr. Bennett said he must have read before reaching a conclusion on what a reasonable person would conclude. But the jury's question is focused on Bennett's testimony. And his testimony was that I didn't think then and I don't think now that the map caused Jared Lochner to act. The jury asks, can we consider from a response by Mr. Bennett, put by the defense, that the fact the defendants posed the question invalidate this inference and can it contribute to the evidence brought forth by the plaintiff? Judge Rakoff says the answer given by Mr. Bennett and a reasonable inference drawn therefrom is not sufficient in itself to carry the plaintiff's burden. So under your thinking, if a plaintiff on the stand says, yep, I knew it was false. I'm glad I said it. I'd say it again. Your view is they can't rely on that. They can't rely on that statement. No, Your Honor. That is not our position. That would be an admission. Isn't that the argument here that this was an admission? But, Your Honor, you have to read the rest of Mr. Bennett's paragraph of testimony on that regard in which a few sentences later he explains that he was not, that is not at all what he thought he was saying. But this, again, is a jury question, isn't it? This question is whether this goes to the jury and whether the jury can consider this to be an admission or whether they should credit the qualification that is given later in the testimony. Your Honor, I mean, there are two different issues, obviously, the Rule 50 judgment and the jury issue. But here, with respect to that particular testimony by Mr. Bennett, this, again, goes to what his subjective state of mind was at the time of publication. And he explains that he never thought he was asserting that the map was the proximate cause, much less that Mrs. Palin personally was responsible for the circulation of the map. And so I, again, just urge the Court to read the portion. And, again, this assumes this is the question and answer about which the jury was asking. We don't know because plaintiffs did not want to inquire of the jury which question and answer. Fairness. That was before the judge said he was going to give the second part of that answer. He asked if you want me to inquire further when their suggestion was you should say just answer the first part. Yes, you can consider the testimony regardless who asked the question. Fair? Fair enough, Your Honor. Yeah. All right. But, in fact, there were multiple points at which Bennett's testimony, if construed a certain way, would cut against him. And we've talked about them, about the prior reading, but also about the admission, the so-called admission. You know, he never thought about the – it's the first admission. I don't think then and I don't think now that the map caused Jared Loeffner to act. The jury could take that into consideration as, in effect, an admission on his part of knowledge of the falsity of his statement. And at the same time, the judge's decision about how to read Bennett's testimony and not make inferences against that would apply to that as well, right? Again, given the overall testimony at that moment, that testimony does not fall into the bucket of flat-out admission that Your Honor had raised a moment ago, where the author says, you're darn right, I knew I was lying. I'm not sure I'm quoting you exactly, but that was the point you were making, Your Honor. Those are two different buckets here. And in this case, the instruction to the jury, which again, they have the full written instructions in front of them throughout the trial, simply says that alone is not – an inference drawn from that is not alone enough. That one statement and the inference drawn from it is not alone enough to carry the burden, which is correct. The courts have repeatedly held, including this court, that there must be some affirmative evidence of knowing falsehood beyond inferences drawn. I'm perplexed at that. There must be some affirmative evidence. The affirmative evidence is that he's read by his own acknowledgment an editorial that says it would be mistaken to attribute the act directly to Republicans. And he writes, the link to political incitement was clear. It's the Virginia shooting about which there's no sign of incitement as direct, using the word direct, as in the Giffords attack. That's the affirmative evidence, the juxtaposition of what he read by his own admission and what he wrote. Why isn't that enough? Again, Your Honor, as Mr. Bennett explained, he was referring to the fact that a person, or in this case, a congressperson, who was the victim of an attack had been mentioned in what many people at the time considered violent political rhetoric. That was the link between the victim. But that's the testimony the jury doesn't have to have accepted. Correct. OK. So assuming they don't accept it, why isn't the fact that he read this article or this editorial and yet wrote something in contradiction to it enough to support a finding for the plaintiff? I disagree that it's in contradiction with it, Your Honor. Again, this is an area where the plaintiff alleges a particular defamatory meaning that readers would infer from the words used rather from the specific words themselves. Because the specific words used in the editorial do not say, Sarah Palin personally caused the shooting by circulating the map. You're focusing on the noun, who caused it. That's part of it. The defamation here is that the link to political incitement was clear and that it was direct. Referring again to the fact that a victim, as Mr. Bennett explained, was mentioned in one of the pieces of violent political rhetoric circulating at the time. Thank you. My only question was then, doesn't the instruction that you can't draw negative influences from what Bennett says, maybe I've mischaracterized that a bit, but whatever the instruction was, putting aside the whole question of the charge as a whole and the fact that the jury has to take that into account, but doesn't that also cover his statement, I didn't think then and don't think now, that the map caused Jared Loftner to act. In other words, wasn't the jury instructed that that statement just by itself might not be, that they couldn't take that into account? Your Honor, I don't think that's the import of the instruction here, because it's focused on what inferences they would draw from a statement. And what he explains is that a single inference by itself is not sufficient. And that is a correct statement of the law. So it does not say they cannot take it into account, but that they cannot rely alone on that. The last line or line and a half of the note to the jury is, but such it, such an inference, can contribute to the other evidence brought forth.  Thank you, Your Honors. We'll hear back from Mr. Vogt. Three minutes or so. Thank you, Your Honor. Give or take. I'm going to go back to some language that Judge Rakoff used at the summary judgment stage, because I think it's important to put into context the Rule 50 decision and why it's deficient. He said, taken in a light most favorable to plaintiff, the evidence shows Bennett came up with an angle for the editorial, ignored the articles brought to his attention that were inconsistent with this angle, disregarded the results of the research he commissioned, and ultimately made the point he set out to make in reckless disregard of the truth. That's exactly what the evidence at trial showed here. Except it was more significant, because at trial, as we've been discussing so far, Mr. Bennett admitted that he had, in fact, read editorials circulated on the day of publication. Not only had he read them, but we discovered, and it came out at trial, that he had actually sent an email saying these ones are more relevant to what we're writing about, which shows comprehension of the articles that we've been talking about today, that say things such as it's facile and mistaken. So Judge Rakoff seemed at one point to make a distinction between an editorial and sort of a factual statement, suggesting that editorials are opinions, and so they're not entitled to the kind of weight that a factual assertion would be entitled to. So a news article would be treated different than an editorial. I guess I'm curious about that. I mean, in your view, anybody who reads an editorial that takes a different position, is that on notice of the possible falsity of their statement? Well, editorials, just like any other piece, are based on facts. They're not devoid of factual content. And in particular, when we talk about this specific situation, the Loeffner shooting, some of the evidence the court excluded, but these articles as well, point out the fact that in this one, the media got this so wrong. We're talking about what he read before the editorial was published, right? So principally, you're relying on two prior New York Times editorials, correct? Two editorials. The ABC article, the hyperlink on that was not an editorial. Well, I agree, and Judge Rakoff at the Rule 50 said that he wasn't even going to consider it because he basically said there's not sufficient evidence that Mr. Bennett clicked on it. Right, and read it, which, again, is a credibility issue, which is a problem that we had that's part of the argument we have on the exclusion of a number of articles. Did that go to the jury? Did the ABC news article go to the jury? I believe that the article did go to the jury. And the article. I believe that it did. But in the Rule 50 decision, Judge Rakoff said, I don't care, it's not enough, because Mr. Bennett testified he didn't read it or he didn't click on the link, and I believe him, which is a credibility determination and a weighing of evidence. That's the same problem there was with other articles that were excluded at trial, as well as we brought up the fact that evidence concerning Mr. Bennett's brother. There was evidence at the trial that as far as that particular item was concerned, that there were research, there were fact-finders and fact-checkers all the way through this thing, and there was a debate as to whether Williamson's fact-checking was sufficient or whether he needed to go fact-check, Bennett needed to go fact-check on the link as well. And the jury was capable of finding that, believing all of the procedures there, which did not cover Bennett's fact-checking on it. They were capable of believing that, but Judge Rakoff didn't give them that opportunity in the Rule 50 decision. Therein lies the problem, and it permeates a lot of the questions that have been asked today, is that he took this from the jury with this Rule 50 decision. And I- He took it from the jury, but he didn't say, you're excused. He didn't bring them in after he reached his decision and say, you're excused. They continued to deliberate. They did. They did. Again, exposed to the push notifications and to a jury instruction, and one of the things we argue is the timing of this jury instruction is one of the things that the case law takes into consideration. It's timing and whether it's on a dispositive issue. This jury instruction that we've been talking about that was given in response to their question was given at a critical point during deliberations, and around the same time that Judge Rakoff's decision had made its way into the jury room. But you're also arguing that the instructions on defamation were wrong, right, with respect to actual malice. I'm not talking about Sullivan. I'm talking about the Ninth and Seventh Circuits, sort of second prom, what Mr. Brown has been describing today. We have objected to a trial and preserved and argued here that we shouldn't have been required to prove actual analysis to meaning. As you noted, the Second Circuit has never required that. And as we've argued based on the case law, that concept has been applied in situations where you're talking about defamation by implication cases. Not where you have language that's clear and easily understandable and what a judge determined to be defamatory per se on its face, which requires no inferences other than the language itself. And that the judge also determined was other than concerning. It should always equal actual malice, right? I mean, otherwise you wouldn't have to make the point. I'm sorry, I didn't hear the first part, Your Honor. A finding of defamation is not the equivalent of finding actual malice. No, it's not. It's not. But the point that I was trying to make there is that you have already on this concept of, I don't think legally it's required that you show defamatory meaning, particularly where you're talking about statements that are alleged to be and proven to be, as they were here, defamatory on their face. But even if that were the case, the first line of testimony, and this wasn't a coincidence, out of Mr. Bennett's mouth at trial, the first things I asked him were, you would expect your readers to understand the dictionary definitions of the terms you used in this, like incitement and clear and direct. And he said yes. That's why we did that, to sort of take, if this is a requirement, it took that arrow out of the quiver. And it was ironic because Judge Rakoff picked up on it so much of an extent that he started pulling out his dictionary during trial when people tried to waver on what the definition of incitement was. It was obvious what was happening here. It was sort of a case being put together to fit a theory when, quite frankly, the facts didn't fit it. He knows what the word incitement means. This is an incredibly intelligent man. He's the head of the opinion section of the New York Times, who was the chief editor of the Atlantic. One of your other arguments is that the Atlantic pieces that were written while he was editor should have come in as well, even though there was no direct proof that he had read them or seen them. Correct. And I think those should – well, there's two things there that I don't want to lose sight of, because one of these is extremely important. One of the things that Judge Rakoff excluded was actually an article that was entitled How the Media Botched the Arizona Shooting. But they weren't, in the end, published in the Atlantic, correct? I'll get to that. This was actually emailed to him. This was separately emailed to him. So there's an email to Mr. Bennett with that article, because he has colleagues that are sending him that article for potential publication. But you see, with that, he denies having seen them. Right. And so to that extent, Judge Rakoff's instruction, you can't draw an inference from his testimony, might have been directed toward that kind of testimony, which would, if believed, would leave the jury with no evidence about whether he had seen it or not. That's the difference between that and the Times editorial that he agrees to having seen. Right. Well, on that one, I mean, you're essentially saying if Mr. Bennett testifies that I don't remember seeing something, that he can exclude it from evidence. Not only that, because it was a two-step inquiry Judge Rakoff had for us to get this evidence, like the Atlantic articles or other articles omitted, we had to establish, according to Judge Rakoff, one, that Mr. Bennett testified that he read it, and number two, that he actually recalled reading it at the time that he wrote this editorial and consciously disregarded what he had learned in that article, which is not an appropriate evidentiary standard. And because that's the standard he used and it's so fundamental, and it's on such a critical issue in the case, on actual malice, that's fundamental error that requires reversal on the exclusion of those pieces of evidence. We're not talking about a lot of articles. I mean, we're talking here about literally a piece that says how the media botched the Arizona shooting. Another one was actually a New York Times piece that was from around the time of the shooting that said the same thing, Time the Enemy, and talks about how the New York Times had screwed up on covering the Loeffner shooting and jumping too quick to blame Governor Palin. And there are a few articles from the Atlantic that said the same thing. With Mr. Bennett's testimony that during that time period, he consumed, he was a regular reader of all of those publications, number one. Number two, his testimony that he had a heightened interest in not just political rhetoric, but also gun control. You had him moderating a gun control debate at which Gabby Giffords appeared. I mean, all of these things that this court touched on in its original opinion in this case, reversing the dismissal, the evidence, I mean, from our perspective, was stronger on those issues. You know, back at that dismissal stage, Mr. Bennett said, I don't remember if I recall reading all these articles within the Times or not. And this court found that they were still sufficient to demonstrate actual matters. Well, at trial, he finally conceded, oh, yeah, I did read those. And in fact, I emailed a couple of them and said, these ones are more relevant. So, I mean, our case got better despite the fact that we believe that critical evidence was excluded. And I can't understate the importance of that. This standard is incredibly hard to meet. It's one of the problems I have with it. It's incredibly hard to meet. There's courts that call it a nearly insurmountable obstacle. We took that on. We tried to do it. We tried to do it even after evidence that would have helped us was excluded. The standard is so hard to meet that the prejudicial nature of the errors in this case were exponentially harmful because we have a burden to prove an incredibly high standard and by clear and convincing evidence. And so we're now stuck in a position where recognize circumstantial evidence of actual malice. And really, if you look at the case law, we're supposed to be entitled to put as much up as we want because it's subjective standards of circumstantial evidence is key. We get articles excluded that talk about how the media botched the Arizona shooting. We get jury instructions that essentially tell the jury you can't really rule in their favor. I mean, that's essentially what this instruction we've been talking about does. And it was unnecessary. And it was at a critical point in the trial. I mean, don't lose sight of the fact that the jury had deliberated far longer than a lot of people thought they would. They even went home for the weekend. And they continued to deliberate on that Monday, and they asked for two things. They asked for Mr. Dalvit's testimony, and then they asked for Mr. Bennett's testimony. And then they asked this question, and then we get this instruction. I think we certainly understand the arguments, a lot of different issues and moving parts. Thank you both. Thank you. We will reserve decision.